**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**AMANDA ELIZABETH JOHNSON**                                                    **PLAINTIFF**

**VS.**                                                            **CIVIL ACTION NO. 3:11CV11**

**BENTON COUNTY SCHOOL DISTRICT**                                       **DEFENDANT**

<u>**ORDER**</u>

This cause comes before the court on the motion of defendant Benton County School

District ("BCSD" or "the school district") for summary judgment, pursuant to Fed. R. Civ. P. 56.

Plaintiff Amanda Elizabeth Johnson has responded in opposition to the motion, and the court,

having considered the memoranda and submissions of the parties, concludes that the motion is

not well taken and should be denied.

This is a wrongful termination action filed by plaintiff under the Americans With

Disabilities Act (ADA) and the Family and Medical Leave Act (FMLA), arising out of her 2010

termination as a school teacher for the BCSD. Plaintiff worked as a teacher for the school

district for thirteen years, and she contends that "for about twelve of those years, [she] had no

problems performing her job." This changed on August 31, 2009, when she seriously injured her

knee while chasing a school bus to attempt to retrieve a student. Plaintiff sustained a tear to her

medial meniscus, which left her in serious pain and unable to stand to teach her classes at

Ashland Middle School. The school district allowed plaintiff to teach while sitting in a recliner,

but plaintiff asserts that it refused her request to be allowed to use a wheelchair. In her

deposition, plaintiff's principal Rosie Ladd denied this assertion.

Plaintiff's knee injury required her to undergo surgery in early November 2009, but her

1

pain and disability continued even after that surgery.  The injury required plaintiff to miss a total

of fifty-three workdays during the 2009-10 school year, and BCSD Superintendent Dr. Patrick

Washington testified that this posed a severe hardship for the school district and plaintiff's

students.  Defendant alleges that, apart from missing so many days, plaintiff exhibited poor work

performance in a number of respects, such as failing to properly prepare lesson plans for her

substitute teachers and repeatedly falling asleep in the recliner provider for her use.  Plaintiff

denies this assertion.

Plaintiff testified that she did not initially seek FMLA leave since she was receiving

workers' compensation benefits, but she asserts that she had requested FMLA leave by October

2009.  The parties disagree, however, regarding whether plaintiff properly responded to the

school district's request for medical certification under the FMLA.  In February 2010, Dr.

Washington provisionally terminated plaintiff pending a formal hearing based upon, *inter alia*,

her excessive number of work days missed and failure to provide proper FMLA certification.

The school board formally terminated plaintiff the next month, following a dismissal hearing.

Plaintiff filed a charge of discrimination with the EEOC, and she initially alleged race and sex

discrimination in addition to her claims under the FMLA and ADA.  Plaintiff subsequently filed

the instant action in this court, although she dropped her earlier claims of race and sex

discrimination and now seeks recovery solely under the FMLA and ADA.

Defendant has presently moved for summary judgment, contending that there exists no

genuine issue of material fact regarding either of these claims and that it is entitled to judgment

as a matter of law.   The court considers first defendant's motion to dismiss plaintiff's ADA

claim.  As to this claim, plaintiff alleges both that she was terminated because of her alleged

disability and that defendant failed to offer her reasonable accommodations for it. Defendant

notes that, to establish a viable claim for discrimination under the ADA, a plaintiff must

establish (1) that she is an individual with a disability, (2) that she was a "qualified individual"

for her job, despite her disability, and (3) that she was discharged because of her disability.

*Carmona v. Southwest Airlines, Co*., 604 F.3d 848, 854 (5th Cir. 2010). If the plaintiff satisfies

each of these elements, the employer must come forward with legitimate, non-discriminatory

reasons for its termination decision. *Adeleke v. Dallas Area Rapid Transit*, WL 3655341, *1 (5th

Cir. Aug. 27, 2012). Plaintiff then bears the burden to show that these reasons are a pretext for

discrimination or are only some of the reasons for its conduct and another motivating factor is

the plaintiff's protected characteristic. *Id.*

> In seeking summary judgment as to plaintiff's ADA claims, defendant argues as follows:

> > Given the expansive definition of the term "disability" under the ADA
> > Amendments Act of 2008 ("ADAAA"), the District does not dispute, **for the
> > purposes of summary judgment only**, that Plaintiff suffers a qualifying
> > disability. Instead, Plaintiff's ADA claim fails because Plaintiff is not a "qualified
> > individual" for her job. In order to demonstrate that an employee is qualified for
> > her job, she must show that she can perform the essential functions of her
> > employment with or without reasonable accommodation. *Rodriguez v. ConAgra
> > Grocery Prods. Co*., 436 F.3d 468, 475 (5th Cir. 2006). "Essential functions are
> > the fundamental duties of the job at issue and do not include the job's marginal
> > functions." *EEOC v. E.I. Du Pont de Nemours & Co*., 480 F.3d 724, 730 (5th Cir.
> > 2007) (citation omitted).

Defendant further argues that, based on this standard, plaintiff is not a "qualified individual"

since she was frequently prevented by her disability from even showing up to work.

Specifically, defendant argues that:

> > In this case, the record shows that Plaintiff could not perform an indisputable and,
> > indeed, the most "essential function" of her job—attendance. The Fifth Circuit
> > has repeatedly held that "[a]n essential element of any . . . job is an ability to
> > appear for work . . . and to complete assigned tasks within a reasonable period of

time." *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) (quoting *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994)). "An employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" *Id.* (quoting *Tyndall v. Nat'l Educ. Centers, Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)). An employer is not required to offer indefinite leave in order to reasonably accommodate an employee struggling to maintain consistent attendance at work. *Id.* At the time of her dismissal, Plaintiff had missed 53 ½ of a total 120 school days and had been tardy 14 other times. Perhaps more importantly, at the time of Plaintiff's dismissal, the District still had no information concerning when she would return to work full time and on regular duty.

The court finds that genuine fact issues clearly exist regarding plaintiff's ADA claims. Whether a particular plaintiff is so hampered by physical illness that, even with reasonable accommodations by the employer, she is unable to perform the job in question is a rather classic fact question of an ADA lawsuit. In this case, it appears that both sides have legitimate arguments to make to the jury in this regard. For its part, defendant argues that plaintiff simply missed too many school days to be considered a qualified teacher, even with reasonable accommodations. Plaintiff, by contrast, argues that defendant did not make sufficient efforts under the ADA to accommodate her disability to allow her to perform her job.

While the court views this as being a classic jury issue, it does not assist defendant's case that plaintiff testified that, in this case, Dr. Washington repeatedly took her to task for "scooting around" in her chair. Specifically, plaintiff testified as follows:

Q: Well, tell me about any conversations that you had with Mr. Washington involving you rolling around in your chair.
A: He told me he didn't want me scooting around in it. How unprofessional it looked. ...
Q: Approximately how many times had Mr. Washington reprimanded you for the unprofessional behavior of scooting around on that chair during that time period?
A: Verbally, less than ten. Okay. But you'd catch the look. If he didn't stop by and take a moment to see me - they positioned my - my classroom right next to the office. And he'd make sure that he'd come from that office - if he came in for no other reason to stand there, catch my eye, give me a look of disapproval and

4

> walk back away.  Or at the bell ringing, if it was close enough, he'd be outside.
> And I'd joke, you know, that I was scooting around and doing my best. And you
> know, I was like, just, I'd like to have the wheelchair.
> Q: Approximately how many times did Mr. Washington refer to that conduct as
> "unprofessional" or "undesirable"?
> A: Plenty and less than ten.  I don't know. Seven, eight, nine.

If believed by a jury, plaintiff's testimony might be seen as supporting a conclusion that Dr. Washington harbored unreasonable and stereotypical views about the ability of individuals with disabilities to perform their work duties.  As discussed below, some of Dr. Washngton's own statements in this case appear to buttress this conclusion.

The court notes at this juncture that, while Dr. Washington appears from the record to be a dedicated superintendent who sincerely cares about the welfare of his students, there is a serious question in the record as to whether he fully understands his obligations under federal law.  In his deposition, Dr. Washington testified that plaintiff's work issues were partly "an issue with her being able to walk and do the work that teachers who didn't have that health issue would normally be able to do."  Dr. Washington made his view in this regard even more explicit in his February 8, 2010 termination letter to plaintiff, where he told her that "[u]nfortunately, there are no reasonable accommodations to allow you to stay seated at all times."  While the jury will decide the issue, it strikes this court as being questionable at best for Dr. Washington to have believed that an ability to walk was a necessary part of being a school teacher.  Apparently, Dr. Washington would view a paraplegic as being unable to be a school teacher at all, but this strikes the court as being simply incorrect and likely contrary to federal law.  The court therefore has little difficulty in concluding that genuine fact issues exist regarding plaintiff's ADA claim, and defendant's motion for summary judgment will therefore be denied as to this claim.

The court now turns to defendant's motion to dismiss plaintiff's FMLA claims.

5

Defendant notes that, in order to prevail on her FMLA claim, Plaintiff must demonstrate (1) that she is protected under the FMLA; (2) that she suffered an adverse employment decision; and (3) a causal link exists between the adverse action and the request for leave. *Bocalbos v. Nat'l Western Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998). If she can satisfy this test, the burden shifts to the District to articulate a non-discriminatory reason for its adverse employment action. *Id.* Plaintiff must then show that the District's reasons are pretextual or that the exercise of her FMLA rights was a motivating factor in the District's termination decision. *Id.*

A ruling upon defendant's motion to dismiss plaintiff's FMLA claims is more problematic, since defendant has raised questions about whether plaintiff complied with the FMLA's procedural requirements in this case. Specifically, in seeking to dismiss plaintiff's FMLA claims, defendant relies upon an argument that she did not provide the proper medical certification that was required under the Act. The FMLA was enacted in 1993, in part, to provide job security for employees with "serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4) (1999). To effectuate this goal, the FMLA entitles employees to take reasonable leave for approved medical reasons. *Id.* § 2601(b)(2).

During a 12-month period, an eligible employee may take a total of 12 workweeks of leave in connection with "a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D). The FMLA also provides that "[a]n employer may require that a request for leave ... be supported by a certification issued by the health care provider of the eligible employee." *Id.* § 2613(a). If the employer does require medical certification, it must give the employee at least 15 calendar days in which to

6

submit the certification. 29 C.F.R. § 825.305(b) (2002). Such a medical certification is considered sufficient if it contains certain information, including: (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) if the leave is for the employee's own serious health condition, a statement that the employee is unable to perform the functions of his or her job.[1] 29 U.S.C. § 2613(b). If an employer requests such documentation, it is required to notify the employee of the consequences for failing to provide an adequate certification. 29 C.F.R. § 825.301(b)(1)(ii). If the employer finds the certification form incomplete, the employer must advise the employee of the deficiency and provide the employee a reasonable opportunity to cure any such deficiency. *Id.* § 825.305(d).

Defendant's sole basis for seeking dismissal of plaintiff's FMLA claims on summary judgment is a procedural argument that she provided inadequate notice of the details of her medical condition. While the court addresses this procedural argument in depth below, it first notes that, if plaintiff were found to have complied with the notice requirement, then the

---

[1]This last requirement, that a doctor state "that the employee is unable to perform the functions of his or her job," appears to have been effectively modified by the FMLA forms prepared by the Department of Labor for doctors to fill out. Indeed, the form provided by defendant for plaintiff's physician, Dr. William Rice to fill out, and which he did eventually fill out, simply asks for the details of plaintiff's medical condition and treatment with no request for a certification that plaintiff was unable to perform the functions of her job. This is likely because, while a doctor is in a position to know the details of his patient's treatment, medical condition and physical limitations, he is not in a position to know exactly what the plaintiff's work duties entail. As discussed below, when Dr. Rice eventually filled out the FMLA form, he provided virtually the same information which he had previously provided on his own forms. The court views this fact as casting serious doubt upon the validity of defendant's notice-based defense.

substantive merits of her FMLA claims would arguably be strong.  Indeed, the first reason cited

by defendant in its brief for terminating plaintiff is "excessive absences," even though it appears

to be undisputed that, at the time she was fired, plaintiff had not taken the full twelve weeks of

FMLA leave to which she was entitled.  Moreover, defendant does not dispute that plaintiff did,

in fact, suffer from a genuine knee injury requiring surgery, and it was aware of that surgery at

the time of the accident.

At the time it fired plaintiff, defendant knew that she was in the process of claiming

FMLA leave.  In her deposition, the district's HR director Rosemary Thompson testified that she

was aware of this fact when she faxed the FMLA form to Dr. Rice's office on January 27.

Specifically, Thompson testified as follows:

> Q: So I know this is an obvious question, but sometimes I have to ask those.
> Assume then that the school district knew that Ms. Johnson was in the process of
> requesting leave under the Family Medical Leave Act as of January 27, 2010.
> A: Okay.
> Q: Is that true?
> A: I mean, yeah, we had been trying to get this done.  This happened way before
> January 27.  She just had never did it.

The actual form faxed to Dr. Rice on January 27, supports Thompson's testimony in this regard,

plainly telling Dr. Rice that "[t]he employee listed above has requested leave under the FMLA to

care for your patient."

Thus, the record clearly demonstrates that defendant knew that plaintiff was suffering

from a serious knee injury, that she was in the process of seeking FMLA leave, and that she had

not yet exhausted the leave to which she was entitled under the FMLA.  For defendant to openly

terminate plaintiff, in part, for "excessive absences" must, under these circumstances, be

regarded as a highly risky move legally.

In justifying its decision to fire plaintiff, defendant argues that she failed to respond in the manner which it requested for more medical information. Defendant notes that, in late November 2009, Dr. Washington wrote plaintiff a letter informing her that "you have not provided the District with sufficient information to determine which, if any, of your absences are covered by the Family and Medical Leave Act." The letter concluded by informing plaintiff that defendant expected her to be at work on November 30, 2009 and that:

> Enclosed with this letter is a Department of Labor form that you should have your doctor complete regarding your absences this school year. We need that information to determine if the absences were covered by the FMLA. Please return the completed form within fifteen days to the [sic] Mrs. Rose Thompson.

Plaintiff admits that she did not turn in the FMLA form as directed, although, as discussed below, she maintains that her treating physician Dr. Rice did finally complete and send in the FMLA form on January 27, 2010. The issue of whether Dr. Rice actually returned this form on January 27 is a disputed fact issue which this court discusses below.

Defendant relies heavily upon the late November letter and upon plaintiff's apparent belief, in her testimony, that she had been derelict in providing FMLA notice, albeit based upon a number of mitigating factors. Arguably the most important of these mitigating factors is plaintiff's testimony in her deposition that she was initially told by her workers' compensation adviser that, since she was receiving workers' compensation benefits, she did not need to request FMLA leave from her employer. Specifically, plaintiff testified in her deposition as follows:

> Q: In the letter Mr. Washington mentions your FMLA paperwork; is that right? Is that your understanding from the letter?
> A: Yes.
> Q: Okay. Were you aware that you needed to return this paperwork to get FMLA leave?
> A: I was aware that they were requesting it. I had an adjustor from workman's comp and a counselor from workman's comp, both of them said that it was

> unnecessary and that I was already on workman's comp leave, that I did not need
> FMLA. And I said, well, my employer is asking me for FMLA and you're telling
> me I don't need it. I'm already on workman's comp leave.

This strikes the court as being a credible basis for plaintiff to have initially been confused

regarding whether she was required to submit a request for FMLA leave. Plaintiff also testified

at her dismissal hearing that she was dilatory in providing the requested FMLA documentation

because "the pain [of her knee injury] was too much."

Plaintiff thus plainly appeared to doubt whether she had provided proper notice under the

FMLA, but, as a layperson, she is not in a position to know exactly what her obligations under

the Act were. While a plaintiff bears ultimate responsibility for providing notice under the

FMLA, the FMLA regulations look to an employee's *doctors* to actually provide the medical

information in question. *See* 29 CFR § 825.303. This is, obviously, because doctors are the ones

who actually have this medical information. In her deposition, plaintiff finally appeared to

recognize this distinction, testifying that, while she herself had not provided proper FMLA

notice, her physician Dr. Rice had done so. Defendant seizes upon this testimony as a departure

from plaintiff's earlier testimony, but the court finds plaintiff's distinction in this regard to be

entirely valid.

Ultimately, the court concludes that plaintiff does, in fact, have Dr. Rice  to thank for

giving the school district notice of the course of her treatment and the specific work limitations

which she faced as a result. The court finds this notice to have been provided not only in the

FMLA form signed by Dr. Rice and dated January 27, 2010, but in a number of prior reports as

well, which contained almost identical information. Specifically, the record contains a number

of faxed reports from Dr. Rice's North Mississippi Sports Medicine & Orthopedic Clinic which,

10

in the court's view, contain the essential information to which an employer is entitled under

FMLA regulations.   Defendant does not dispute that it received these reports.  For example Dr.

Washington noted in his late November letter that:

> On November 11, 2009, you provided the District with a statement from North
> Mississippi Sports Medicine & Orthopedic Clinic indicating that you were unable
> to work from November 11, 2009, through November 15, 2009.  You were
> released to return to work on November 16, 2009, through December 4, 2009,
> with the following limitations: no prolonged standing or walking, no climbing,
> bending or stooping, and no squatting or kneeling.

In his letter, Dr. Washington expressed dis-satisfaction with the extent of the information which

Dr. Rice had provided, but, as discussed below, the court finds his reports to have been thorough

and clearly designed to provide the school district with the best information feasible about

plaintiff's condition.

Typical of these reports is a faxed report from Dr. Rice dated December 4, 2009 which

diagnosed plaintiff with a "knee meniscus tear" and which provided defendant with specific

information regarding the dates on which she was authorized to return to limited duty and the

specific number of hours which she was able to work.  The December 4 report stated that

plaintiff was authorized to return to limited duty from November 30, 2009 to December 18,

2009, which Dr. Rice initially indicated meant working four hours a day.  As with his earlier

report, Dr. Rice clarified plaintiff's specific physical limitations.  Indeed, Dr. Rice's form

provided what strikes this court as being a very informative list of fourteen specific physical

limitations which his patients might face, and he "checked' four of those limitations as to

plaintiff, namely "no prolonged standing or walking, no climbing bending or stooping, no

squatting or kneeling and no repeated climbing."   The record includes a followup report from Dr.

Rice dated January 6, 2010, which authorized plaintiff to return to limited duty on January 6,

11

2010 and which reiterates the physical limitations which she faced. A January 20, 2010 report

from Dr. Rice notes that plaintiff had been receiving treatments for "swelling and pain" and it

provided dates under which she was able to work limited duty and days on which she was unable

to work at all.

The reports from Dr. Rice strike the court as being detailed and informative regarding the

nature of plaintiff's condition and her ability to work, and it appears that their primary deficiency

is that they were not set forth in the actual FMLA form which had been provided for plaintiff.

Defendant makes much of the issue regarding whether Dr. Rice actually sent in the FMLA form

which had been provided to him on January 27. While this court initially regarded this fact issue

as being a significant one, it has since come to regard it as something of a red herring.

Defendant argues in its brief that it never received this form, writing that:

> On January 27, 2010, District Human Resources Director Rosemary Thompson
> faxed Plaintiff's physician the FMLA certification form at Plaintiff's behest.
> Thompson testified at plaintiff's dismissal hearing that she never received the
> completed form.

For her part, plaintiff testified in her deposition that Dr. Rice did, in fact, send the form on

January 27, 2010, but she does not make clear how she has personal knowledge of this fact.

Unfortunately, neither side has seen fit to depose Dr. Rice himself on this (or any other) issue,

nor does either side appear to have made factual inquiries with his staff.

Ultimately, the court concludes that the issue of whether Dr. Rice returned the form on

January 27, or whether defendant first saw it at plaintiff's March termination hearing (as it

contends), is irrelevant. This is because the actual *content* of that FMLA report signed by Dr.

Rice is virtually *identical* to the reports which he had been diligently preparing on his own forms

during the prior weeks and months. As he had written on his own forms, Dr. Rice set forth, on

12

the FMLA form, the dates on which plaintiff would be able to return to limited duty, the number of hours she was able to work, and the physical limitations which she faced. The only significant difference which this court can discern between the prior reports sent by Dr. Rice and the disputed January 27 report is that the latter was generated on a Department of Labor form, rather than Dr. Rice's own form. Accordingly, to treat this issue as being anything other than a red herring would, in the court's view, be a triumph of form over substance.

In its brief, defendant takes issue with Dr. Rice's inability to set a specific date on which plaintiff would return to work. Specifically, defendant argues that:

> The medical excuses Plaintiff provided from the North Mississippi Sports Medicine & Orthopedic Clinic consistently changed both the date Plaintiff was expected to return to regular duty and the dates of her limited duty recommendations. For instance, only one of the excuses provided by Plaintiff even stated a proposed date for her return to work with no work limitations. This excuse, dated December 4, 2009, stated that Plaintiff could return to work with no limitations on January 4, 2010. Yet in an excuse dated January 6, 2010, Plaintiff was provided with further limited duty recommendations and no proposed date for return to regular duty.

This argument is consistent with the school district's objections to Dr. Rice's reports at the time.

This court does not doubt that the school district was genuinely frustrated by Dr. Rice's lack of certainty regarding plaintiff's future recovery, but this is a medical uncertainty issue rather than an FMLA notice issue. It seems clear to this court that Dr. Rice was making diligent efforts to give his best estimate regarding the future course of plaintiff's medical recovery, and defendant is not allowed to seek summary judgment based upon his lack of medical clairvoyance. In the court's view, the simple fact is that sometimes, due to no fault of their own, employees get sick, and sometimes their doctors are unable to state with any medical certainty exactly when they will sufficiently recover to be able to return to work. Dr. Rice was plaintiff's

13

primary treating physician, and no one was in a position to have greater knowledge regarding her medical condition than him.

Dr. Rice repeatedly provided his best estimates regarding plaintiff's prognosis, but the fact is that such medical prognoses are frequently uncertain and they frequently change. The court has little difficulty in concluding that the FMLA notice provision should not be used to punish plaintiff for their doctors' inability to offer a clear date on which they will recover. Under the FMLA, the school district was entitled to Dr. Rice's evaluation of plaintiff's medical condition and its impact upon her ability to work, and it received that, on multiple occasions. The district was not, however, entitled to medical certainty about that which was, in the view of plaintiff's treating physician, medically uncertain.

The fact that defendant has made such a large issue over the return of the specific FMLA form, when Dr. Rice had already been provided essentially the same information on a number of occasions, makes its notice defense seem somewhat disingenuous. Indeed, there is considerable evidence in the record which suggests that the school district's issue was not so much that it was not provided information regarding the limitations which plaintiff faced, but that it was simply not prepared to accept those limitations. At plaintiff's dismissal hearing, Dr. Washington came close to conceding as much, noting that he received and considered Dr. Rice's January reports stating that plaintiff was only able to work limited duty consisting of five hour work days. Specifically, Dr. Washington testified as follows:

> Q: Okay, can you as a superintendent, you know, allow, I guess, teachers to work - a teacher to work five hours a day indefinitely?
> A: No. It actually- that's something the district can not do. And there's several reasons the district cannot do it. Because one, first of all, it's unfair to kids. And two, it's difficult to secure a substitute for a few hours a day, especially, at the rate we're able to provide for them. And then, thirdly, it's something that we

can't do consistently for our staff. And that's something that a district cannot do. While understandable on a human level, this testimony raises doubts regarding whether defendant's choice to rely upon a procedural notice defense in this case was entirely sincere.

Defendant has repeatedly argued that it was not given notice of the nature of plaintiff's medical limitations, but when given a specific estimate by Dr. Rice that plaintiff would be able to work five hour days, it used the substance of that estimate in support of its decision to terminate her. That is not a notice issue.[2] In the court's view, if defendant had wished to mount a substantive defense to plaintiff's FMLA claim, then it could and should have done so openly. The FMLA would have given the school district options in this regard, inasmuch as it only provides employees with a finite amount of unpaid leave each year. If plaintiff's illness and limitations had continued indefinitely, then she would have eventually exhausted that leave. Instead, defendant has relied upon a notice defense which the court finds to be both legally meritless and arguably disingenuous.

In arguing that inadequate notice was provided, defendant relies upon *Urban v. Dolgencorp of Texas, Inc.*, 393 F.3d 572 (5th Cir. 2004), where the Fifth Circuit held that the § 825.305(d) provision requiring employers to provide employee a reasonable opportunity to cure any deficiency in her medical certification form did not apply where the employee had never submitted any medical certification at all. In the court's view, the obvious fact distinguishing this case from *Dolgencorp* is that, in this case, Dr. Rice was making efforts all along to keep

---

[2]The court does not rule out the possibility that some kind of substantive defense might be available under the FMLA in cases where a plaintiff is repeatedly forced to miss a few hours a day. No such substantive defense has been raised in this case, however, which makes it seem likely that it does not exist.

defendant informed of the nature of plaintiff's medical situation and her physical limitations. In the court's view, § 825.305's certification requirement, and its opportunity for "reasonable cure" is appropriately considered in the context of FMLA notice regulations as a whole. These regulations provide that "the employee need not expressly assert rights under the FMLA or even mention the FMLA," emphasizing that the employee's burden is to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *See* 29 CFR § 825.303.

The FMLA protects employees suffering from serious medical conditions, not merely those with a clear and certain prognosis. In the court's view, it would distort the basic purpose of the FMLA to allow its notice provisions to, in effect, be used as a "sword" against seriously ill employees in cases where their doctors are simply not in a position to state with any certainty what the future course of their illness will be. In the court's view, the FMLA implicitly addresses such uncertain cases by providing a twelve-week unpaid leave limitation which, in and of itself, provides some degree of certainty to employers. The court therefore finds defendant's FMLA notice objections, based upon the changing and sometimes uncertain nature of Dr. Rice's opinions, to lack merit as a matter of law.

Even assuming that this court's legal conclusion in this regard is erroneous, it would still conclude that proper notice was provided under the facts of this case. That is, even assuming, *arguendo*, that the FMLA report signed by Dr. Rice has some special significance which is not apparent to this court, and assuming further that defendant is correct that it was first made aware of the form at the March 2011 dismissal hearing, then this court would still conclude this was not too late as a matter of law to submit it, under the facts of this case. While this was truly the "last

16

possible moment" for plaintiff to have submitted relevant information in support of her position, Dr. Washington made it clear in his termination letter that the dismissal hearing would be plaintiff's opportunity to make her case as to why she should not be terminated. In the court's view, the school district should have been willing to consider Dr. Rice's form at the March 11 hearing based both upon the previously discussed mitigating factors, but also based on real doubts regarding whether the school district would be acting contrary to federal law in terminating plaintiff.

Obviously, the school board's role at the March 2011 hearing was not simply to "rubber stamp" Dr. Washington's decision to terminate plaintiff, but to actually consider the evidence against her. This opportunity would have little meaning if the board was unwilling to even consider the evidence which she presented. Plaintiff had been given no formal hearing prior to the March session before the school board, and the hearing thus appears to have been more in the nature of a trial than appellate proceeding. Accordingly, the court sees little argument that plaintiff should be barred from presenting Dr. Rice's form for the first time at the hearing, assuming that defendant is correct that it did not see it before then.

In the court's view, the school board should also have been motivated to consider any evidence that plaintiff might have in her favor by the very real questions in the record regarding the legality of her termination. In particular, the school board had before it Dr. Washington's February termination letter where he expressed his view that "there are no reasonable accommodations to allow you to stay seated at all times." At the hearing, plaintiff specifically raised this issue, asking the board at the conclusion of the hearing as follows:

> Plaintiff: Oh, no - can I ask one more? .... Are we still standing by that I am
> terminated because of inability to reasonably accommodate me to remain seated

> at all times?
> [Counsel for school district]: I think the documents speak for themselves. We're
> not going to answer that question.

While the jury can make a final determination in this regard, the court views this as being an

interesting exchange on multiple levels. First, it appears to reflect a recognition by both plaintiff

and counsel for the school district that Dr. Washington's views on the subject of reasonable

accommodation were of a suspect nature legally. Second, it makes it clear that the suspect

nature of Dr. Washington's views was clearly made apparent to the board, which likely should

have made it more likely to take a fresh look at the evidence as a result. Aside from some of Dr.

Washington's questionable views regarding disability, the school district had before it a

recommended termination of an employee who was seeking FMLA leave and who had not yet

exhausted the full leave provided under the Act. For such a termination to have been

recommended, at least in part, based upon the plaintiff having missed too many work days

should likely have raised "red flags." From reviewing the transcript hearing, it is arguable that

the school board was "circling the wagons" around Dr. Washington's decision to terminate

plaintiff, but, if so, it was not its role to do so.

The court also notes that, in addition to Dr. Washington's suspect views regarding the

subject of reasonable accommodation under the ADA, his letters and testimony appear to betray

a less than complete understanding of plaintiff's rights under the FMLA. In particular, Dr.

Washington made repeated reference to plaintiff having simply missed too many days, and he

placed great emphasis on the hardship caused to students by her absences. Consistent with Dr.

Washington's concerns, defendant writes in its brief that, in deciding to fire plaintiff, it

"concluded that Plaintiff could not perform the essential duties and/or functions of her job and

that students were suffering tremendously due to her constant absences from the classroom." While this is an entirely understandable concern on a human level, the fact remains that there is no "school" exception to the FMLA, and plaintiff, as a school teacher, had the same rights as any other employee to claim FMLA leave.

It strikes this court that, to some extent, defendant is attempting to re-fight certain policy battles which have already been decided against it by Congress in enacting the FMLA. In enacting the FMLA, Congress gave employees the right to twelve weeks a year in unpaid leave for serious medical issues, and defendant is not free to shorten that time period, even based on a sincere and commendable concern for the welfare of students. In enacting the FMLA, Congress had to weigh the very real hardships caused to employers by lengthy medical absences against the hardships endured by employees who, due to no fault of their own, suffer from serious illnesses. The result of this weighing of competing factors was the present-day FMLA, and its provisions, while subject to interpretation, are not negotiable.

While the court thus finds that plaintiff has potentially strong claims, it would hasten to add that her case faces a number of obstacles as well. As noted previously, defendant raises a number of serious allegations against plaintiff - which she generally disputes - including that she was repeatedly caught sleeping in class and that she failed to properly assist her substitute teachers in preparing lesson plans for her students. If the jury finds these allegations to be credible, then it may well be inclined to rule against her. Plaintiff's case will also likely take a credibility hit in the jury's eyes from the fact that she initially argued, before the EEOC, that she

was terminated partly on the basis of her race and/or sex.[3]  While it will be for the jury to evaluate the credibility of plaintiff's claims, the court concludes that it should be given a chance to do so.

In light of the foregoing, the court finds genuine fact issues in this case regarding 1) whether defendant violated the ADA in failing to reasonably accommodate plaintiff and in terminating her, and 2) whether defendant violated the FMLA by terminating plaintiff. Defendant's motion for summary judgment will therefore be denied.

SO ORDERED, this the 20th day of February, 2013.

**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

---

[3]In this court's experience, plaintiffs frequently allege alternate theories of discrimination in such a manner, apparently to keep their options open. More often than not, however, it only ends up damaging their case, since it makes it appear that the plaintiff herself did not have a clear idea as to why she was terminated.